1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8  SEAN C. DAVENPORT,

9                             Plaintiff,

10           v.

11  MICHAEL J. ASTRUE, Commissioner of
    Social Security,

12                             Defendant.

13

Case No. C12-736-JLR-BAT

**REPORT AND
RECOMMENDATION**

14        Sean C. Davenport seeks review of the denial of his Supplemental Security Income

15  application.  He contends that the ALJ erred by **(1)** improperly rejecting the opinions of Mr.

16  Davenport's treating, examining, and reviewing medical sources; **(2)** improperly ignoring lay

17  witness statements; **(3)** failing to conduct an adequate step five analysis; and **(4)** improperly

18  denying Mr. Davenport his due process right to testify at a hearing.  (Dkt. 17.)  As discussed

19  below, the Court recommends the case be **REVERSED** and **REMANDED** for further

20  administrative proceedings.

21                    **I.        FACTUAL AND PROCEDURAL HISTORY**

22        Mr. Davenport is currently 47 years old, has a high school education, and has experience

23  as a construction day laborer (through temp agencies) and a short order cook, though he has,

since 1990, been arrested over 50 times and spent cumulatively about 15 years in prison.  (Tr. 134, 140, 143, 257.)  On July 7, 2009, he applied for benefits, alleging disability as of January 1, 2008.[1]  (Tr. 134.)  His application was denied initially and on reconsideration.  (Tr. 51–60.)

The ALJ conducted a hearing on December 1, 2010.  (Tr. 16–33.)  Mr. Davenport's attorney appeared on his behalf but did not know his client's whereabouts.  (Tr. 36–37.)  Although counsel had not been in contact with his client for a month-and-a-half, counsel assured the ALJ that Mr. Davenport knew the hearing date because counsel had left voicemail messages.  (*Id.*)  The ALJ examined the exhibits and a vocational expert ("VE"), and Mr. Davenport's attorney made arguments and questioned the VE.  The ALJ then issued a notice to show cause asking Mr. Davenport why he had not appeared at the hearing.  (Tr. 110–14.)  On December 22, 2010, i.e., six days after the deadline, the ALJ received Mr. Davenport's show-cause statement.  (Tr. 115.)  Mr. Davenport stated that "[m]y reason for missing my hearing is because at times I get dates and times confused and November was a short month [and] I got turned around."  (*Id.*)  Thereafter, the ALJ found that Mr. Davenport had not established good cause for his failure to appear and thus had constructively waived his right to appear for a hearing.  (Tr. 19–20.)  The ALJ issued a decision on the record finding Mr. Davenport not disabled.  (*Id.*)

As the Appeals Council denied Mr. Davenport's request for review, the ALJ's decision is the Commissioner's final decision.  (Tr. 1–6.)

## II.    THE ALJ'S DECISION

Utilizing the five-step disability evaluation process,[2] the ALJ made the following findings:

**Step one:**  Mr. Davenport had not engaged in substantial gainful activity since July 7,

---

[1] At the hearing, Mr. Davenport's attorney amended the alleged onset date to July 7, 2009, to coincide with the protective filing date.  (Tr. 39.)

[2] 20 C.F.R. §§ 404.1520, 416.920.

2009.

**Step two:** Mr. Davenport had the following severe impairments: degenerative disc disease ("DDD") of the lumbar and thoracic spine, obesity, schizoaffective disorder, post-traumatic stress disorder ("PTSD"), and sleep disorder.

**Step three:** These impairments did not meet or equal the requirements of a listed impairment.[3]

**Residual Functional Capacity ("RFC"):** Mr. Davenport had the RFC to perform a range of medium work as follows: he can lift up to 50 pounds occasionally and lift and/or carry up to 25 pounds frequently. Pushing and pulling are unlimited except for that shown for lifting and carrying. He could perform simple, routine tasks and follow short, simple instructions. He could do work that needs little or no judgment and could perform simple duties that can be learned on the job in a short period. He would have average ability to perform sustained work activities (i.e., can maintain attention and concentration; persistence, and pace) in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) within customary tolerances of employers' rules regarding sick leave and absence. He could have occasional interactions with co-workers and supervisors and can work in close proximity to co-workers but not in a cooperative or team effort. He could deal with occasional work setting changes. He would not deal with the general public as in a sales position or where the general public is frequently encountered as an essential element of the work process. Incidental contact with the general public is not precluded.

**Step four:** Mr. Davenport has no past relevant work. Transferability of job skills is not an issue.

**Step five:** As there are jobs that exist in significant numbers which Mr. Davenport can perform, he is not disabled.

(Tr. 16-29.)

### III.      DISCUSSION

Mr. Davenport does not here challenge the ALJ's determinations regarding physical impairments. The parties disagree about the severity of Mr. Davenport's mental impairments. The Court will reverse the denial of a disability claim only if the ALJ's decision was not supported by substantial evidence in the record as a whole or if the ALJ applied the wrong legal standard. *See Stone v. Heckler*, 761 F.2d 530, 531 (9th Cir. 1985). The Court may not reverse

---

[3] 20 C.F.R. Part 404, Subpart P. Appendix 1.

REPORT AND RECOMMENDATION - 3

1     an ALJ's decision on account of harmless error. *See Stout v. Comm'r, SSA*, 454 F.3d 1050,

2     1055–56 (9th Cir. 2006).

3          As to **Issue 1**, the Court finds that the ALJ improperly disregarded aspects of the opinions

4     of Mr. Davenport's treating, examining, and reviewing medical sources because even the most

5     skeptical medical examiner qualified his opinion by noting that he reviewed scant medical

6     records, made internally inconsistent statements that must be further clarified, and referred to

7     limitations that appear to have been omitted from the RFC determination.  As to **Issue 2**, the

8     Court finds that it was not harmless error for the ALJ to have improperly ignored lay witness

9     testimony.  The Court's findings regarding Issue 1 and Issue 2 moot the necessity of addressing

10    **Issue 3** (step five evaluation) and **Issue 4** (due process challenge) at this time.

11          The Court recommends **reversing** the ALJ's decision because it was not supported by

12    substantial evidence.  But the Court recommends **remanding** for further administrative

13    proceedings, rather than for an award of benefits, because there are outstanding issues that must

14    be resolved before a disability determination can be made, and it is not clear from the record that

15    the ALJ would be required to find the claimant disabled if all the evidence were properly

16    evaluated.  *See Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009).  On remand, the ALJ

17    should reopen the hearing to receive additional evidence and permit Mr. Davenport to testify,

18    make an assessment of Mr. Davenport's credibility, reevaluate the medical and lay testimony,

19    reassess RFC, and reexamine his step five analysis.

20          **A.**     **Medical Testimony**

21          Mr. Davenport argues that the ALJ did not sufficiently support disregarding aspects of

22    treating, examining, and reviewing medical sources regarding Mr. Davenport's limitations from

23

schizoaffective disorder and PTSD.[4]  The Court agrees.

The ALJ's evaluation of the medical record as a whole was that Mr. Davenport is capable of work-related activities, particularly when medically compliant:

> [T]hroughout the medical records, the claimant's treatment providers indicate that the claimant has improved from a psychological standpoint and even suggest a plan for him that includes consistent employment (Exhibit 16F, p. 2, 11, 12).  At one point, recently, the claimant stated he stopped taking his medication because he felt things were going well and felt that he might not need them anymore (Exhibit 16F, p. 1).

(Tr. 26.)  The ALJ gave great weight to the opinion of consultative psychiatric examiner **Dr. Markus Ploesser, M.D.**, and substantial weight to state agency reviewer **Dr. Kent Reade, Ph.D.**, and to the affirmation of Dr. Reade's opinion by state agency reviewer **Dr. Renee Eisenhauer, Ph.D.**  (Tr. 27.)  The ALJ gave little weight to the opinions of treating providers **Meg Wolf, M.A.**, **Suzanne Shadix, ARNP**, and **Dr. Susan Woyna, M.D.**

The Court finds that the ALJ's evaluation of the medical evidence was undermined by omissions of relevant factors and citation to several reasons that were neither specific nor legitimate.  First, the ALJ did not appear to consider that examining psychiatrist Dr. Ploesser qualified his opinion by noting that he reviewed scant medical records, made statements that appear to be internally inconsistent, and set forth functional limitations regarding traditional work stressors and a "history of angry outbursts" that were neither discussed nor accounted for in assessing RFC.  Second, in the absence of heavy reliance on Dr. Ploesser's opinion, the ALJ could not rely substantially on the non-examining state agency reviewers' conclusions given

---

[4] Where uncontradicted by another doctor, a treating doctor's opinion may be rejected only for "clear and convincing reasons," or for "specific and legitimate reasons" if contradicted.  *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1996); *see Valentine v. Comm'r SSA*, 574 F.3d 685, 692 (9th Cir. 2009).  More weight is to medical opinions that are explained than to those that are not, *see* 20 C.F.R. § 404.1527(d)(3), and to the medical opinions of specialists concerning matters relating to their specialty over that of nonspecialists, *see id.* § 404.1527(d)(5).  *See Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001).

their summary nature and failure to discuss or review nearly all the relevant medical records.

Third, because the ALJ discounted the treating providers' opinions by citing a mixture of reasons

that were valid, invalid, and ambiguous, there are outstanding medical issues that must be

resolved before a disability determination may be made.

       **1.**        **Consulting Psychiatric Examiner Dr. Markus Ploesser, M.D.**

      Dr. Ploesser examined Mr. Davenport on August 30, 2009.  Dr. Ploesser noted upfront

that he received and reviewed exactly four days worth of medical reports: (1) May 1, 2009,

office visit notes from Dr. Tina Shereen; (2) April 8, 2009, office notes by Dr. Shereen; (3) June

19, 2008, notes by Ellison Roberts, ARNP; and June 10, 2008, notes by Dr. Mark Mesik, M.D.

(Tr. 257.)  Dr. Ploesser diagnosed Mr. Davenport with "[m]ood disorder not otherwise specified,

possibly depression not otherwise specified"  and assessed a Global Assessment of Functioning

("GAF") score of 75.  (Tr. 261.)  Thereafter, Dr. Ploesser provided the following functional

assessment:

> It is my opinion that the claimant could manage his own funds, but only to a limited degree due to his difficulties with calculation and possible substance use.

> It is my professional opinion that the claimant does have the ability to perform simple and repetitive tasks, but not more complex tasks.

> It is my opinion that the claimant is able to abstract simple instructions from supervisors.  **The limiting factor would be the claimant's history of anger outbursts.**  Of note, if the claimant's anger outbursts are, indeed, attributable to a traumatic brain injury, which does not seem clear at this point, the symptoms may be treated to a certain degree with medication.

> It is my opinion that the claimant could perform simple work activities on a consistent basis without special instructions.

> He is, in my opinion, not hindered by mental illness to attend work regularly.

> I believe that **his ability to deal with the usual stressors in the work environment is rather limited**.

1  (Tr. 262 (emphases added).)

2        With respect to disputed issues, the ALJ gave great weight to Dr. Ploesser's opinion that

3  Mr. Davenport presented with a vague history of depression and paranoia, the paranoid

4  symptoms appeared to be related to claimant's longstanding incarceration, and the auditory

5  hallucinations (e.g., telling Mr. Davenport to steal or to use drugs (Tr. 258)) appeared to be

6  unusually specific and not related to his current mood symptoms.  (Tr. 27.)  The ALJ also

7  adopted Dr. Ploesser's assignment of a GAF score of 75, which represents symptoms that are

8  transient and expectable reactions to psychosocial stressors and impose no more than slight

9  impairment in social, occupational or school functioning.  (Tr. 27); *see* American Psychiatric

10  Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. 2000) ("DSM-IV-TR").

11        Unless the record is further developed, Dr. Ploesser's medical opinion contains

12  qualifying language, ambiguities, and internal inconsistencies that preclude affording great

13  weight to his conclusions regarding the minimal severity of Mr. Davenport's mental

14  impairments.  First, Dr. Ploesser's two-sentence discussion of PTSD is internally inconsistent.

15  Dr. Ploesser states: "The claimant also reports vague symptoms of posttraumatic stress disorder,

16  but only when asked about the specific symptoms.  It is my opinion that most of the claimant's

17  symptoms can be explained by adaptations to his longstanding incarceration."  (Tr. 262.)  Dr.

18  Ploesser thus appears both to suggest that Mr. Davenport does not suffer from PTSD symptoms,

19  and that Mr. Davenport's symptoms appear to be the result of stress from a past traumatic event

20  (i.e., incarceration).  Second, Dr. Ploesser's assessment of a GAF score of 75 appears to be at

21  odds with his conclusion that Mr. Davenport's "ability to deal with the usual stressors in the

22  work environment is limited," as well as with his conclusion that Mr. Davenport's capabilities

23  are limited by a "history of anger outbursts" that may or may not be alleviated by medication.

1   (Tr. 262.)  Third, Dr. Ploesser qualified his opinion by noting that he reviewed only four days of

2   clinical notes from Pike Market Medical Clinic, where Mr. Davenport had been seen only

3   sporadically.  (Tr. 257.)[5]  That is, although Mr. Davenport established care with mental health

4   specialists and the specialists' notes in large part predate Dr. Ploesser's report (*see generally* Tr.

5   285–302, 317–47), **Dr. Ploesser reviewed none of the relevant treating providers' clinical**

6   **evaluations** and noted that it was "unclear, based on the information submitted to our office, if

7   the claimant is treated for the symptoms he reports in a sufficient manner.  It appears that he only

8   takes Seroquel at a very low dose and trazodone for sleep.  It is unclear if he is receiving

9   treatment for his mood symptoms and perceptual disturbances."  (Tr. 262.)

10          Moreover, it is unclear how or whether the ALJ's assessment of RFC reflects Dr.

11   Ploesser's conclusions regarding Mr. Davenport's limited ability to deal with traditional stressors

12   of work and history of angry outbursts.

13          The Court finds that the ALJ did not provide specific and legitimate reasons for relying

14   heavily on Dr. Ploesser's opinion to find that Mr. Davenport's mental impairments were limited

15   in severity, and that it is unclear how or whether the RFC assessment reflects Dr. Ploesser's

16   conclusions that Mr. Davenport had a limited ability to deal with traditional work stressors and

17   would be limited by his history of angry outbursts.

18

19   _____

20   [5] Although Mr. Davenport presented with mental health concerns, the clinicians at Pike Market
     Medical Clinic do not appear to be specialists in mental health.  Neither party evaluates these
21   clinical notes and more weight should be afforded to treating mental health specialists regarding
     their specialties.  *See* 20 C.F.R. § 404.1527(d)(5); *Holohan*, 246 F.3d at 1202.  Regardless, the
22   clinical notes reviewed by Dr. Ploesser appear to have limited relevance: in 2008 intake notes,
     Dr. Micek provides a clinical assessment that "[t]he patient is a 43 year old male"; in 2008 notes,
     Nurse Practitioner Roberts assessed moderate, recurring, depressive disorder; in April 2009
23   notes, Dr. Shereen assessed chronic depressive disorder; in May 2009, Dr. Shereen assessed
     chronic depressive disorder and "possible BAD [Bipolar Affective Disorder]."  (Tr. 239–46.)

REPORT AND RECOMMENDATION - 8

1    **2.      State Agency Reviewers Drs. Kent Reade and Renee Eisenhauer**

2          The ALJ gave substantial weight to the opinion of non-examining medical source Dr.

3    Reade, and its affirmation by non-examining medical source Dr. Eisenhauer, because Dr. Reade

4    concluded, consistently with Dr. Ploesser's assessment of a high GAF score, "that the claimant is

5    able to understand, remember, and carry out simple one[-] or two-step instructions."  (Tr. 27.)

6    Mr. Davenport does not challenge the limitation to simple one- or two-step instructions; rather,

7    he notes that the ALJ did not comment on Dr. Reade's finding of moderate limitations in **(1)** the

8    ability to carry out detailed instructions, **(2)** the ability to maintain attention and concentration

9    for extended periods, and **(3)** the ability to complete a normal workday and workweek without

10   interruptions from psychologically based symptoms and to perform at a consistent pace without

11   an unreasonable number and length of rest periods.  (Tr. 277–78.)

12         The opinion of a non-examining doctor cannot alone constitute substantial evidence that

13   warrants the rejection of the opinion of either an examining or treating physician.  *Lester*, 81

14   F.3d at 831. The rejection of the opinion of an examining or treating physician may, however, be

15   based in part on the testimony of a nontreating, non-examining medical advisor, when consistent

16   with other independent evidence in the record.  *Morgan v. Apfel*, 169 F.3d 595, 602 (9th Cir.

17   1999).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the

18   facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."

19   *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.1989) (internal quotation marks omitted).

20         Here, the ALJ gave substantial weight to the opinions of Drs. Reade and Eisenhauer

21   based in large part on their concurrence with Dr. Ploesser's conclusions, the shortcomings of

22   which the Court has already addressed.  For similar reasons, the opinions of the non-examining

23   state agency reviewers cannot, without further development of the record, constitute substantial

REPORT AND RECOMMENDATION - 9

evidence that warrants the rejection of the opinions of Mr. Davenport's treating medical sources. The Court agrees with the Commissioner that the ALJ appears to have accounted for the Point 1 and Point 2 moderate limitations set forth by Drs. Reade and Eisenhauer when assessing RFC. The Court agrees with Mr. Davenport that the ALJ does **not** appear to have considered the Point 3 moderate limitation—Mr. Davenport's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods—in assessing RFC. The Court also notes that reliability of the opinions by the non-examining "reviewers" deserves closer scrutiny.  Although Drs. Reade and Eisenhauer purport to have reviewed all current evidence, they do not appear to discuss any evaluations by Mr. Davenport's treating mental health care providers by name, date, or content.  (Tr. 279, 303.)[6]

### 3. Treating Medical Sources Meg Wolf, M.A., Suzanne Shadix, ARNP, and Susan Woyna, M.D.

The ALJ gave little weight to the conclusions provided by Mr. Davenport's treating providers at Community Psychiatric Clinic—Ms. Wolf, ARNP Shadix, and Dr. Woyna—that Mr. Davenport had marked, functional mental limitations, fit a GAF score between 45 and 47, and had moderate, marked, and severe limitations in cognitive and social factors.  (Tr. 27.)  The ALJ discounted those treating opinions because **(1)** they were deficient or incomplete regarding objective observations; and **(2)** the conclusions were not supported by the clinical notes.  The Court finds that the ALJ cited valid, invalid, and ambiguous reasons for discounting the opinions of the treating medical sources, and omitted altogether a discussion of the checkbox evaluation that Mr. Davenport would miss at least four days a month on a fulltime work schedule.  The net

---

[6] Dr. Reade cites a single treatment date, May 1, 2009.  (Tr. 279.)  Dr. Eisenhauer cites an August 2009 examination, a May 2009 examination, and an October 2009 report.  (Tr. 303.)

result is that **(a)** the remaining, valid reasons for discounting the opinions of the treating medical sources do not constitute sufficient evidence to affirm the ALJ's finding of no disability, but that **(b)** the opinions of the treating medical sources should not be credited as true on the present record.

First, the ALJ stated a **valid** reason for discounting ARNP Shadix's opinion: her failure to respond to the query "[d]escribe what the individual is capable of doing despite his/her impairments." (Tr. 320.) The ALJ also set forth an **invalid** reason for discounting ARNP Shadix's opinion: that ARNP Shadix failed to "cite to objective medical evidence to support her opinion the claimant is unable to function." (Tr. 27.) Under the section entitled "FUNCTIONAL MENTAL DISORDER," ARNP Shadix noted that she personally observed Mr. Davenport's depressed mood, anxiety, and expression of anger, set forth the severity of those symptoms, and narratively described how each symptom affected work activities. (Tr. 318.) The ALJ also set forth a number of **ambiguous** reasons for discounting the opinions of the treating medical sources. The ALJ discounted ARNP Shadix's August 2009 DSHS evaluation because she "does not record any observations under the various factors considered moderate, marked and severe." (Tr. 27.) Similarly, the ALJ criticized Dr. Woyna and Ms. Wolf's July 2010 DSHS evaluation as "deficient as no observations are recorded under the various cognitive factors." In other words, the ALJ found the DSHS checkbox forms themselves—which provide space for optional, one-line observations next to the detailed checkbox descriptions of functional limitations—to be so conclusory as to be of questionable relevance even when filled out in the common manner. (*See* Tr. 320, 326.) In addition, the ALJ discounted Dr. Woyna and Ms. Wolf's evaluation because "the claimant is described as able to keep appointments, regularly attend Bridgeway for chemical dependency issues and gaining insight into his mental illness."

REPORT AND RECOMMENDATION - 11

1    (Tr. 27.)  The Court finds it to be of limited significance to correlate a patient's attendance and

2    compliance with a treatment plan and resultant "insight" with the absence of severe impairments

3    as the result of PTSD and schizoaffective disorder.

4         Second, the record both validates and undermines the ALJ's stated reasons for

5    concluding that the clinical notes of the treating medical sources did not support their

6    conclusions regarding functional limitations.  For example, the ALJ discounted Mr. Davenport's

7    symptoms because "[d]uring a May 2009 intake evaluation the claimant summarized his overall

8    health condition as 'feeling good…strong, healthy."  (Tr. 27.)  The ALJ clearly took that

9    statement out of context and misinterpreted it.  Mr. Davenport was responding to a query to

10   "[s]ummarize health/medical condition, including overall nutrition and access to food."

11   (Tr. 343.)  On the same intake form, Mr. Davenport stated his reason for coming into the clinic:

12   "I don't know what is going on.  Can't tell you.  Depressed…goes up and down.  Get angry

13   a[]lot…I will fight although I try not to.  Don't know what[']s going on with me but there is

14   something."  In a similar vein, the ALJ properly stated the encouraging descriptions of Mr.

15   Davenport's mental status exam drawn from this initial intake from Community Psychiatric

16   Clinic before continuing care at this same clinic was established, but declines to meaningfully

17   discuss differing evaluations by his regular health care providers.  (Tr. 27.)  Thereafter, the ALJ

18   properly refers to Mr. Davenport's capabilities (e.g., Mr. Davenport worked as a janitor for four

19   months, attended a chemical dependency program, had some improvement in symptoms, has

20   developed friendships with women) but declines to meaningfully address the treatment

21   providers' explanations for why Mr. Davenport continues to be mentally impaired in light of

22   such observations.  (*Id.*)

23        The Court notes that although the ALJ rejected as a whole an August 2010 mental

REPORT AND RECOMMENDATION - 12

medical source statement by Ms. Wolf and Dr. Woyna (Tr. 27 (citing Exh. 15F)), the ALJ did not specifically discuss their checkbox conclusion that if Mr. Davenport attempted to work a full-time schedule, he would miss four or more days of work per month on a more probable than not basis (Tr. 331).  Mr. Davenport's attorney posed this hypothetical to the VE at the hearing, and the VE testified that  "it would certainly make it difficult to maintain employment" if a person were miss work about 20 percent of the time.  (Tr. 45.)  Mr. Davenport argues that this conspicuous failure to discuss a relevant restriction means, under *Lester*, that Ms. Wolf and Dr. Woyna's workplace restriction should be credited as true.

Where an ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating . . . physician," that opinion is credited "as a matter of law." *Lester*, 81 F.3d at 834 (citation omitted).  Here, however, the ALJ here provided an amalgam of adequate, inadequate, and questionable reasons to affirm and discount the medical testimony such that crediting as a matter of law only the aspects of opinions favorable to Mr. Davenport would not serve the interest of justice.  The ALJ rejected Ms. Wolf and Dr. Woyna's August 2010 evaluation in its entirety for the same reasons he had rejected all of the treating medical sources' opinions: Ms. Wolf and Dr. Woyna's opinion differed from the opinions of Drs. Ploesser, Reade, and Eisenhauer and, in any event, was conclusory and inconsistent with other clinical notes.[7]  *See, e.g.*, *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.").  *Lester*  is inapplicable here because outstanding

---

[7] The Court notes that the August 2010 "Mental Medical Source Statement" filled out by Ms. Wolf and Dr. Woyna was three pages long and consists entirely of checkbox queries at the end of which was a single block for "ADDITIONAL COMMENTS" that was left blank.  (Tr. 331.)  In comparison, the two separate six-page DSHS forms filled out by the treatment providers, which contain both checkbox queries and narrative descriptions, look like novels.  (Tr. 317–28.)

REPORT AND RECOMMENDATION - 13

1    issues must be resolved before a disability determination can be made and it is not clear from the

2    record that the ALJ would be required to find the claimant disabled if all the evidence were

3    properly evaluated.  *See., e.g.*, *Vasquez*, 572 F.3d at 593.

4          **B.      Lay Witness Statements**

5                 Mr. Davenport argues that it was not harmless error for the ALJ to have improperly

6    ignored the lay witness testimony of his friend Tammy Desmarteau.  (Tr. 153–60.)  He is correct.

7                 Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's

8    ability work is competent evidence that the ALJ must take into account.  *Nguyen v. Chater*, 100

9    F.3d 1462, 1467 (9th Cir. 1996).  Competent lay witness testimony "*cannot* be disregarded

10   without comment," *id.*, and to discount competent lay witness testimony, the ALJ "must give

11   reasons that are germane to each witness," *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

12   The ALJ is not, however, required to discuss every witness's testimony on an individualized,

13   witness-by-witness basis.  *Molina*, 674 F.3d at 1114.  "Rather, if the ALJ gives germane reasons

14   for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting

15   similar testimony by a different witness."  *Id.*

16                The ALJ made no allusions whatsoever to Ms. Desmarteau's lay witness statements, and

17   Ms. Desmarteau's statements were consistent with Mr. Davenport's description of his symptoms

18   to health care providers as well as with the opinions of Mr. Davenport's treating medical sources.

19   The ALJ therefore committed reversible error.

20         **C.      Remand for Further Administrative Proceedings**

21                Mr. Davenport argues that the improperly rejected medical testimony and lay witness

22   statements should be credited as true and this matter remanded for an award of benefits.  The

23   Court disagrees.

REPORT AND RECOMMENDATION - 14

In *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996), the Ninth Circuit held that a court should credit improperly rejected evidence and remand for an award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* at 1292. "Of course, *Smolen*'s three-part test really constitutes a two part inquiry, wherein the third prong is a subcategory of the second: if the ALJ were not 'required to find the claimant disabled' upon crediting the evidence, then this certainly would constitute an 'outstanding issue that must be resolved before a determination of disability could be made'" *Harman v. Apfel*, 211 F.3d 1172, 1178 n.7 (9th Cir. 2000) (quoting *Smolen*) (brackets removed).

Even if the erroneously rejected lay witness statements are accepted as true, the ALJ would not be required to find Mr. Davenport disabled: Ms. Desmarteau provided competent evidence that must be considered but did not provide conclusive medical evidence that Mr. Davenport cannot work. Similarly, as discussed earlier, a number of outstanding medical and other issues must be resolved before a disability determination can be made. On remand, the ALJ should reopen the hearing to receive additional evidence and permit Mr. Davenport to testify, make an assessment of Mr. Davenport's credibility, reevaluate the medical and lay testimony, reassess RFC, and reexamine the step five analysis. *See, e.g.*, *Bunnell v. Barnhart*, 336 F.3d 1112, 1115–16 (9th Cir. 2003) (remanding for further administrative proceedings rather than for award of benefits was required in response to ALJ's failure to provide adequate reasons for rejecting opinion of treating physicians and failure to properly reject claimant's subjective complaints and lay testimony, where outstanding issues remained).

### D.     Step Five Evaluation and Due Process Right to Testify

The Court's recommendation to remand for further proceedings moots Mr. Davenport's

assignments of error in Issues 3 and 4.  On remand, the ALJ will have the opportunity to revisit his step five analysis, and Mr. Davenport will have an opportunity to testify at a hearing.

### IV.    CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's decision be **REVERSED** and the case be **REMANDED** for further administrative proceedings.

On remand, the ALJ should reopen the hearing to receive additional evidence and permit Mr. Davenport to testify, make an assessment of Mr. Davenport's credibility, reevaluate the medical and lay testimony, reassess RFC, and reexamine his step five analysis.

A proposed order accompanies this Report and Recommendation.  Objections, if any, to this Report and Recommendation must be filed and served no later than **January 18, 2013.**  If no objections are filed, the matter will be ready for the Court's consideration on **January 25, 2013**. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  Objections and responses shall not exceed twelve pages. The failure to timely object may affect the right to appeal.

DATED this 4th day of January, 2013.


_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 16